UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:

MED-STOP, INC., a Delaware corporation,

Plaintiff,

v.

VANDUTCH, INC., a Florida corporation,
VANDUTCH USA, INC., a dissolved Florida corporation,
JACOBUS ANKO MAST, individually
REED NICOL, individually, and
CANTIERE DEL PARDO, S.p.A., an Italian joint-stock company,

Defendants,

_____/

## COMPLAINT FOR FRAUDULENT INDUCEMENT, CIVIL THEFT, CONVERSION, BREACH OF FIDUCIARY DUTY AND FRAUD

Plaintiff, **MED-STOP, INC.**, submits its complaint (the "Complaint") for fraudulent inducement, civil theft, conversion, breach of fiduciary duty, and fraud committed by the Defendants **VANDUTCH, INC.**, a Florida corporation, **VANDUTCH USA, INC.**, a dissolved Florida corporation, **JACOBUS ANKO MAST**, a Turkish foreign national, **REED NICOL**, a Florida resident, and **CANTIERE DEL PARDO**, **S.p.A.**, an Italian joint-stock company, and says:

### PARTIES

1. **MED-STOP, INC. ("MED-STOP"** or **"PLAINTIFF")** is a Delaware Corporation with its principal place of business located in Chicago, Illinois.

1

2. **VANDUTCH, INC.** is a Florida corporation conducting a yacht brokerage, sales, and distribution business within the Southern District of Florida (the "District").

3. **VANDUTCH USA, INC**. is a dissolved Florida corporation that was formed to conduct a yacht brokerage, sales, and distribution business within the District.

4. **JACOBUS ANKO MAST ("JACOBUS MAST")**: (a) is an indirect owner, a director, and the president of **VANDUTCH, INC.**; (b) is a former director and the immediate past-president and COO of **VANDUTCH USA, INC.**; and (c) is a Turkish foreign national engaged in the yacht brokerage, sales, and distribution business within the District.

5. **REED NICOL**: (a)is a past vice-president and COO of both **VANDUTCH, INC.** and **VANDUTCH USA, INC.**; (b) is a member of the International Yacht Brokers Association; and (c) is a Florida resident engaged in the yacht brokerage, sales, and distribution business within the District.

6. **CANTIERE DEL PARDO, S.p.A.** ("CDP"): (a) is an Italian joint-stock company engaged in the manufacture, sale, and distribution of luxury yachts, including the VanDutch yacht line, the Pardo yacht line, and the Grand Soleil yacht line; (b), is a party to a written yacht distribution agreement (the "Distribution Agreement") with **VANDUTCH USA, INC.** lasting from June 8, 2020 through May 7, 2021; and ( c) is, and has been, actively engaged in the yacht solicitation, promotion, sales and distribution business within the District by, including but not limited to: (i) accepting - and filling at least one of - the VanDutch yacht customer manufacturing orders originating from **VANDUTCH, INC.** in 2020 and 2021; (ii) advertising its yachts and services over the global internet at its interactive websites found at both

2

vandutch.com and cantieredelpardo.com; (iii) touting specific VanDutch "Centers," including within the District first located at the presently shuttered offices of **VANDUTCH, INC.** and **VANDUTCH USA, INC.**, formerly located at 2300 E. Las Olas Blvd., Ft. Lauderdale (a/k/a VanDutch Center Ft. Lauderdale), and now located in Miami at NW 11th St., 1270 (a/k/a VanDutch Center Miami), as a part of the VanDutch family of luxury yachts and services; (iv) traveling to the District to promote its products and services and to solicit business at various boat shows, including but not limited to its attendance at the 2022 Palm Beach Boat Show as evidenced by the photograph of the "Cantiere Del Pardo leadership team" posted on germainyachts.com under "Pardo Yachts," and sending its Business Development Manager, Rok Babarovic, to the District in 2021 on **CDP** business; (v), representing in its publicly available Code of Ethics that its "collaborators" [like **VANDUTCH, INC.** and **VANDUTCH USA, INC.**] would be informed of, and were bound to adhere to, **CDP's** published Code of Ethics; (vi) incorporating its Code of Ethics, either explicitly or implicitly, within the Distribution Agreement and the yacht sale contract with **MED-STOP**; (vii) delivering its yachts and supplying its services to its luxury yacht customers within the District ; and (ix) in September 2022, promoting the grand opening of **CDP's** VanDutch Center Miami as an "official sales point" for VanDutch yachts with Sergio Sagramoso becoming: (a) a manager of the newly formed VanDutch Americas, LLC, a Florida corporation; and (b) the "official VanDutch representative in the U.S." *See* https://pressmare.it/en/shipyards/vandutch/2022-09-26/the-grand-opening-of-vandutch-center-miami-67852.

3

## JURISDICTION AND VENUE

7. The amount in controversy in this matter exceeds the sum of $75,000.00, exclusive of interest, costs, attorneys' fees, treble damages, and punitive damages.

8. The Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity between the **PLAINTIFF**, a Delaware corporation with its principal place of business in Chicago, Illinois, and the five named defendants (the "**DEFENDANTS**"), who are neither citizens of either Delaware or Illinois, nor have their respective principal places of business in either Delaware or Illinois.

9. Venue is proper in the District as the acts that are the subject of the Complaint, including execution of a VanDutch yacht sale contract with **MED-STOP**, occurred within the District in both Miami and Ft. Lauderdale.

### FACTUAL AVERMENTS:

### A. THE CONTRACT

10. After learning online of **CDP's** touted VanDutch Center Ft. Lauderdale and thereafter negotiating with **REED NICOL**, on March 22, 2021 **MED-STOP** signed a New Purchase Agreement (the "Contract") with **VANDUTCH, INC.** for the purchase of a new forty (40) foot VanDutch yacht (the "Yacht").

11. The Contract was signed by **REED NICOL** on behalf of **VANDUTCH, INC.**

12. The Contract: (a) provided that the Yacht would be manufactured in Italy by **CDP**; (b) specified **CDP's** assigned yacht production number, 40-178 (a/k/a hull #178), and **CDP's** unique craft identification number (the "CIN"), IT-VDI40178XX22, (with the

4

CDP yacht production number, 40-178, incorporated within **CDP's** unique CIN); and

(c) anticipated delivery of **MED-STOP's** Yacht on or before October 29, 2021.

13. The stated purchase price of the Yacht was $751,925.00.

14. The Contract also provided **MED-STOP** with the required wire transfer instructions for **MED-STOP's** initial deposit.

15. The wire transfer instructions within the Contract identified a **VANDUTCH, INC.** account No.: [*REDACTED*] at Bank of America, N.A. in New York to accept the deposit.

16. An authentic copy of the Contract (except only for the redacted account number), is attached hereto.

### B.  THE INITIAL DEPOSIT

17. On the morning of March 24, 2021, **MED-STOP** wired its $150,385.00 initial deposit as instructed in the Contract.

18. Receipt of **MED-STOP's** wire transfer was thereafter confirmed the same day through a 5:29 p.m. text message from **REED NICOL** to **MED-STOP**.

19. Upon information and belief, **JACOBUS MAST** was fully aware of, and both directed and approved, the actions of **VANDUTCH, INC.** and **REED NICOL** regarding entry of the Contract with **MED-STOP**.

### C.  THE FIDUCIARY DUTY

20. On March 22, 2021, **VANDUCH, INC.**, **JACOBUS MAST**, and **REED NICOL** were acting as "persons", as defined in section 326 of the Florida Statutes (Yacht and Ship Brokers Act) (the "ACT"), engaged in the negotiation and sale transaction of a new forty (40) foot VanDutch yacht to **MED-STOP**.

21. On March 22, 2021, **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** were acting with the expectation of compensation from this VanDutch yacht sale transaction.

22. Thus, on March 22, 2021, **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** were acting as yacht Brokers and/or yacht Salespersons as defined in the ACT.

23. Operating as or on behalf of a yacht broker, **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** were required by the ACT to maintain **MED-STOP's** deposit in a trust account with a financial institution located in the state of Florida, and to maintain a separate record of all such monies received and the disposition thereof.

24. Moreover, operating as a yacht Broker in Florida, **VANDUTCH, INC.** owed a fiduciary duty to their buyer, **MED-STOP** and, acting as Brokers or on behalf of a Broker, **JACOBUS MAST** and **REED NICOL** similarly each owed a fiduciary duty to **MED-STOP** consistent with long established Florida law. *See, e.g., Czarnecki v. Roller,* 726 F. Supp. 832, 188-89 (S.D. Fla. 1989) (Acting on behalf of buyer, yacht broker stands as fiduciary to client owing utmost good faith and full disclosure.)

### D.  THE BREACH OF FIDUCIARY DUTY

25. Neither **VANDUTCH, INC., JACOBUS MAST**, nor **REED NICOL** complied with these statutory deposit requirements of the ACT - nor even informed **MED-STOP** of their fiduciary duty to do so.

26. This failure to comply with the ACT was intentional, and: (a) such a failure is *prima facia* evidence of intent to violate the ACT; and (b) constitutes a third-degree felony.

6

27. On March 22, 2021, **VANDUTCH, INC.** also was operating as (and **JACOBUS MAST** and **REED NICOL** also were operating on behalf of) a yacht "merchant" as defined in section 672.104 of the Florida Statutes ("Article 2 of the UCC) engaged in the sale transaction of a new forty (40) foot VanDutch yacht to **MED-STOP**.

28. Operating as, or on behalf of, a yacht merchant in Florida, **VANDUTCH, INC.**, **JACOBUS MAST**, and **REED NICOL** owed an additional statutory duty of good faith (*i.e.* honesty in fact) and fair dealing to their buyer, **MED-STOP.**

29. On March 22, 2021, **VANDUTCH, INC., JACOBUS MAST,** and **REED NICOL** knew, but kept from **MED-STOP**, that **CDP's** manufacture of yachts for at least fifteen (15) of **VANDUTCH, INC.'s** existing VanDutch yacht customers had not even begun, yet no deposits had been returned by **VANDUTCH, INC.** to any of these customers.

30. For example, **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** knew, but did not disclose to **MED-STOP**, that: (a) Florida customer Todd Wenzel had ordered his VanDutch seventy-five (75) foot VanDutch yacht from **VANDUTCH, INC.** in 2019; (b) paid **VANDUTCH, INC.** a $1 million initial deposit (which was deposited into the same numbered account as **MED-STOP's** deposit was directed); (c) received a projected delivery date of September 14, 2020 from **VANDUTCH, INC.**, yet (d) as of March 22, 2021, Todd Wenzel had received neither his VanDutch yacht nor return of his $1 million deposit.

31. By March 22, 2021, **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** also knew, but kept from **MED-STOP**, that: (a) **CDP** was not honoring *any* new or existing yacht contracts originated by **VANDUTCH, INC.**; (b), **VANDUTCH, INC.**

7

had not provided **CDP** any of the contract deposit monies required by **CDP**; and (c)

**VANDUTCH, INC.** still owed **CDP** approximately $2.5 million for a VanDutch

yacht **CDP** had previously delivered.

32. On March 22, 2021, **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL**

also knew, but did not disclose to **MED-STOP**, that "the story" they were telling

Todd Wenzel was that the *delivery* of his yacht was simply delayed due to "COVID

19."

33. Todd Wenzel ultimately instituted arbitration proceedings against **VANDUTCH,**

**INC.** for the return of his deposit.

34. On October 11, 2022, following a consensual arbitration award against

**VANDUTCH, INC.**, Todd Wenzel obtained a default final judgment against

**VANDUTCH, INC.** for his $1 million deposit in Case No. 22-61338-CIV-

SINGHAL, in the United States District Court for the Southern District of Florida

and, despite receiving subsequent promises from **JACOBUS MAST** to satisfy this $1

million judgment, Todd Wenzel has received nothing toward his $1 million judgment.

### E. THE LONG STALL

35. While **MED-STOP** was waiting for updates regarding the manufacture of its Yacht,

**REED NICOL** was busy sending his April 14, 2021 email to  a different prospective

VanDutch yacht customer offering to sell him the very same forty (40) foot

VanDutch yacht, (hull #178) that **VANDUTCH, INC.** already had sold to **MED-**

**STOP** and thereafter: (a) kept this information from **MED-STOP**; (b) failed to

inform **MED-STOP** that this proposed sale to another customer cratered when

**VANDUTCH, INC.** refused this customer's demand to hold his initial deposit in

8

escrow; (c ) resulted in this customer: (i) flying to Italy to deal directly with **CDP's** representative/collaborator and the designer of VanDutch yachts, Frank Mulder; (ii) ultimately purchasing his VanDutch yacht from **CDP**; (iii) having the manufacture and delivery of his VanDutch yacht overseen by Frank Mulder; and, thus (iv) facilitating this customer's opportunity to have his VanDutch yacht now moored in Biscayne Bay.

36. On April 27 and 28, 2021, **JACOBUS MAST** had several email exchanges directly with **CDP** and its representatives regarding the VanDutch yachts already sold by **VANDUTCH, INC.**

37. In his April 27, 2021 email, **CDP's** CEO, Fabio Planamente, reminded **JACOBUS MAST** that, pursuant to their 2020 Distribution Agreement, all VanDutch yacht orders were to have been submitted to **CDP** through **VANDUTCH USA, INC.**, together with a 20% down payment, not through **VANDUTCH, INC.** or some intermediary.

38. **JACOBUS MAST** admitted in an April 28, 2021 email to **CDP** representatives/collaborators, Frank Mulder and Sergio de la Vega, that: (a) **VANDUTCH, INC.** had been telling its customers "stories" to hide from them **CDP's** failure to honor their VanDutch yacht contracts; and (b) cautioned them that, at some point, these VanDutch yacht customers will "need the truth."

39. In his email, **JACOBUS MAST** also predicted that **CDP's** refusal to honor the outstanding VanDutch yacht contracts originated by **VANDUTCH, INC.** would result in "a direct bankruptcy" of **VANDUTCH, INC.** and "3 x Hiroshima."

40. Following a May 5, 2021 meeting of **CDP's** board of directors regarding the numerous **VANDUTCH, INC.** VanDutch yacht customer contracts, **JACOBUS MAST** was informed that **CDP** was terminating the 2020 Distribution Agreement and, with respect to generating new VanDutch yacht contracts within the District, "do it themselves."

41. Notwithstanding: (a) **CDP's** nearly year-long facilitation and support of VanDutch yacht sales by **VANDUTCH INC.**, **JACOBUS MAST**, and **REED NICOL**; (b) its own published Code of Ethics; (c) knowledge of the outstanding and unfilled VanDutch yacht sale contracts originating from **VANDUTCH, INC.**; (d) knowledge that **VANDUTCH, INC.**, **JACOBUS MAST**, and **REED NICOL** owed a fiduciary duty, and duty of good faith and fair dealing to these VanDutch yacht customers; and (e) knowledge that strict adherence to the 2020 Distribution Agreement had previously been waived by the parties; **CDP** chose to quietly terminate the Distribution Agreement without any notification to these outstanding VanDutch yacht customers, including **MED-STOP**, in hopes that **CDP** could effectively distance itself from, and evade its own culpability for, all of these unfilled VanDutch yacht customer contracts and collected deposits.

42. In June 2021, **VANDUTCH, INC.**, **JACOBUS MAST**, and **REED NICOL** knew, but failed to inform **MED-STOP**, that **REED NICOL** had resigned as an officer of both **VANDUTCH, INC.** and **VANDUTCH USA, INC.**

43. On June 28, 2021, **MED-STOP** once again inquired of **REED NICOL** as to the progress being made on the manufacture of its Yacht.

44. Rather than telling **MED-STOP** the truth, **REED NICOL** side-stepped by puting **MED-STOP** in direct communication with **JACOBUS MAST**, the purported owner of **VANDUTCH, INC.**

45. On June 30, 2021, **JACOBUS MAST** spoke with **MED-STOP** and promised to either close the deal, or return **MED-STOP's** deposit, within the next two weeks.

46. This promise was not honored.

47. On July 7, 2021, in his belated response to a further status inquiry from **MED-STOP**, **REED NICOL** offered **MED-STOP** the excuse *du jour* that "[T]here is a massive engine shortage which is postponing our invoicing of "production start" until we can have the engine assignment. [but assured **MED-STOP** that] Technically the lamination has started…"

48. On July 7, 2021, **REED NICOL** either knew, or should have known, that **CDP** had not even begun manufacture of **MED-STOP's** Yacht.

49. Moreover, **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** subsequently failed to inform **MED-STOP** that **VANDUTCH USA, INC.** (the actual party to **CDP's** 2020 Distribution Agreement) was voluntarily dissolved in August 2021.

50. Following additional lies from **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** in response to **MED-STOP's** now repeated demands for the return of its deposit (including a text message from **REED NICOL** as recently as February 23, 2023 informing **MED-STOP** that its "funds [were] almost together for refund"), **MED-STOP** has, to date, not received a return of any of its deposit monies.

**F. THE PRESENT ACTION**

51. **MED-STOP** has recently retained the undersigned to represent it in this matter and has agreed to pay all reasonable attorney's fees, costs and expenses incurred in bringing this action.

52. All conditions precedent to bringing this action have occurred or have been waived.

**COUNT I**

**FRAUD IN THE INDUCEMENT:**

**VANDUTCH, INC., JACOBUS MAST, AND REED NICOL**

53. **MED-STOP** repeats the allegations contained within paragraphs 1 through 52 as if set forth herein at length.

54. The Contract was obtained through knowingly false and reckless misrepresentations and omissions, by **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL**.

55. As previously alleged above, by March 22, 2021, **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** knew, and intentionally kept from **MED-STOP**, that they were not acting in accord with their fiduciary duty to **MED-STOP**, and that none of the **DEFENDANTS** were proceeding consistent with good faith or fair dealing.

56. The alleged intentional misrepresentations and omissions that occurred during the **MED-STOP** Yacht purchase negotiations were intended by **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** to be relied upon by **MED-STOP** and to cause **MED-STOP** to sign the Contract and provide the initial deposit.

12

57. **MED-STOP** justifiably relied upon these intentional misrepresentations and omissions, including but not limited to **CDP's** internet promotions, in signing the Contract and making its initial deposit.

58. All of the above alleged intentional misrepresentations and omissions by the named Defendants were material to: (a) **MED-STOP's** entry into the Contract; (b) **MED-STOP's** partial performance; and (c) **MED-STOP's** continued justifiable reliance upon these Defendants.

59. The Contract's self-serving provisions seeking to strip **MED-STOP** of its right to a jury trial, together with its right to seek "INCIDENTAL OR CONSEQUENTIAL DAMAGES," were intended by **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** to insulate them from full redress by **MED-STOP** for their wrongdoing, and now support **MED-STOP's** right to seek recission.

60. **MED-STOP's** remedy at law is inadequate and, in any event, section 672.721 of the Florida Statutes, which applies to the sale of goods in Florida, specifically provides that "Neither rescission or a claim for rescission of the contract for sale...shall bar or be deemed inconsistent with a claim for damages."

**WHEREFORE, MED-STOP** demands rescission of the Contract and damages against **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL**, not only for the loss of its deposit, but for additional damages measured by the difference between the cost of the VanDutch Yacht bargained for and the cost of the same model VanDutch yacht at time of judgment, pre-judgment interest, and punitive damages as provided by law, together with such other and further relief as this Court shall deem just and equitable.

13

## COUNT II

## CIVIL THEFT:

## VANDUTCH, INC., JACOBUS MAST, AND REED NICOL

61. **MED-STOP** repeats the allegations contained in paragraphs 53 through 60 as if set forth herein at length.

62. By acquiring **MED-STOP's** deposit based upon material misrepresentations and omissions, including the failure by **VANDUTCH, INC.** to maintain the deposit in an escrow or trust account in a bank located in Florida, **VANDUTCH, INC.**, **JACOBUS MAST**, and **REED NICOL** knowingly obtained, or aided and abetted **VANDUTCH, INC.** in knowingly obtaining, $150,385.00 belonging to **MED-STOP** with the intent to appropriate these funds to their own use in violation of sections 812.014(1) and 2(a)(1) of the Florida Statutes.

63. In so doing, **VANDUTCH, INC.**, **JACOBUS MAST**, and **REED NICOL** also committed, or aided and abetted **VANDUTCH, INC.**, in committing, a felony of the third degree as provided in the ACT.

64. **MED-STOP** made written demand on **VANDUTCH, INC.**, **JACOBUS MAST**, and **NICOL REED** as required by section 772.11(1) of the Florida Statutes more than thirty-days prior to the filing of this Complaint, but none of these parties have complied with the demand.

**WHEREFORE, MED-STOP** demands judgment against **VANDUTCH, INC.**, **JACOBUS MAST**, and **REED NICOL** in the amount of threefold its compensatory damage of $150,385.00, for a total net award of $451,155.00, together with pre-judgment interest, reasonable attorney's fees, and court costs as provided by statute, together with

14

such other and further relief as may be provided by law and which this Court shall deem just and equitable.

## COUNT III

### AIDING AND ABETTING CIVIL THEFT:

### VANDUTCH USA, INC. AND CDP

65. **MED-STOP** repeats the allegations contained in paragraphs 61 through 64 as if set forth herein at length.

66. On and before March 22, 2021, **VANDUTCH USA, INC.** and **CDP** knew that **VANDUTCH, INC., JACOBUS MAST,** and **REED NICOL** were entering contracts with, and acquiring deposits from, customers for VanDutch yachts to be manufactured by **CDP**.

67. On and before March 22, 2021, **VANDUTCH USA, INC.** and **CDP** knew that **CDP** was receiving these VanDutch yacht customer contracts from **VANDUTCH, INC.** without objection.

68. On and before March 22, 2021, **VANDUTCH USA, INC.** and **CDP** knew that **VANDUTCH, INC.** did not have a written distribution agreement with **CDP**.

69. On and before March 22, 2021, **VANDUTCH USA, INC.** and **CDP** knew that **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** were acting as yacht brokers or salespersons and as yacht merchants.

70. On and before March 22, 2021, **VANDUTCH USA, INC.** and **CDP** knew that **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** owed a fiduciary duty and a duty of good faith and fair dealing to these VanDutch yacht customers.

15

71. On or before March 22, 2021, **VANDUTCH USA, INC.** and **CDP** knew, or should have known, that **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** were required by law to comply with the ACT and Article 2 of the UCC as adopted in Florida.

72. On and before March 22, 2021, **VANDUTCH USA, INC.** and **CDP** knew that **VANDUTCH, INC.** was acquiring contract deposits from its VanDutch yacht customers but was neither maintaining such deposits in either escrow or trust in a financial institution located in Florida nor remitting any portion of such deposits to **CDP**.

73. On and before March 22, 2021, **VANDUTCH USA, INC.** and **CDP** knew that **CDP** already had honored at least one of the VanDutch yacht customer contracts submitted by **VANDUTCH, INC.** and had delivered the yacht even though this transaction failed to follow the written Distribution Agreement and the fact that **CDP** was still owed approximately $2.5 million from **VANDUTCH, INC.** for the yacht.

74. Notwithstanding this knowledge of continued wrongdoing by **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL**, neither **VANDUTCH USA, INC.** nor **CDP**: (a) took any action to alert authorities as to such wrongdoing as even required by **CDP's** own Code of Ethics; (b) attempt to stop such wrongdoing; (c), warn the known **VANDUTCH, INC.** customers of such wrongdoing; or (d) sought to immediately terminate their respective associations with **VANDUTCH, INC., JACOBUS MAST**, or **REED NICOL.**

75. Given their respective alleged legal and contractual relationships, including **CDP's** glowing website representations regarding its quality and superior business services,

16

and **CDP's** own published Code of Ethics, **VANDUTCH USA, INC**. and **CDP**
undertook a commensurate duty to VanDutch yacht customers including **MED-STOP**, to protect their interests or, at least, not aid and abet **VANDUTCH, INC.**,
**JACOBUS MAST**, and **REED NICOL** in acting contrary to **MED-STOP's**
interests.

76. This alleged complicity by both **VANDUTCH USA, INC**. and **CDP** aided, abetted,
   facilitated, permitted, and allowed the theft of **MED-STOP's** deposit to occur.

77. **MED-STOP** made written demand on **VANDUTCH USA, INC.** and **CDP** as
   required by section 772.11(1) of the Florida Statutes more than thirty days prior to the
   filing of this Complaint, but neither of these parties complied with the demand.

   **WHEREFORE, MED-STOP** demands judgment against **VANDUTCH USA, INC.**
and **CDP** in the amount of threefold its compensatory damage of $150,385.00, for a total
net award of $451,155.00, together with pre-judgment interest, reasonable attorney's
fees, and court costs as provided by statute, together with such other and further relief as
may be provided by law and which this Court shall deem just and equitable.

## COUNT IV

## CONVERSION:

## VANDUTCH, INC., JACOBUS MAST, AND REED NICOL

78. **MED-STOP** repeats the allegations contained within paragraphs 65 through 77 as if
   set forth herein at length.

79. The failure of **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** to
   return **MED-STOP's** deposit despite repeated demands constitutes conversion.

80. As a result of such conversion, **MED-STOP** has been damaged.

WHEREFORE, **MED-STOP** demands judgment against **VANDUTCH, INC.**, **JACOBUS MAST**, and **REED NICOL**, not only for the loss of its deposit, but for additional damages measured by the difference between the cost of the VanDutch Yacht bargained for and the cost of the same model VanDutch yacht at time of judgment, pre-judgment interest, and punitive damages as provided by law, together with such other and further relief as this Court shall deem just and equitable.

## COUNT V

## AIDING AND ABETTING CONVERSION:

## VANDUTCH USA, INC. AND CDP

81. **MED-STOP** repeats the allegations contained in paragraphs 78 through 80 as if set forth herein at length.

82. The alleged complicity of both **VANDUTCH USA, INC.** and **CDP** in failing to take action and notify the VanDutch yacht customers, including **MED-STOP**, of the wrongdoing by **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL**, aided, abetted, facilitated, permitted, and allowed such deposit conversion to occur and continue.

83. Such complicity resulted in damage to **MED-STOP**.

WHEREFORE, **MED-STOP** demands judgment against **VANDUTCH USA, INC.** and **CDP**, not only for the deposit related damages alleged, but for additional damages measured by the difference in value between the VanDutch Yacht bargained for and the cost of the same model VanDutch yacht at the time of judgment, pre-judgment interest, and punitive damages, together with such other and further relief as this Court shall deem just and equitable.

18

**COUNT VI**

**BREACH OF FIDUCIARY DUTY:**

**VANDUTCH, INC., JACOBUS MAST, AND REED NICOL**

84. **MED-STOP** repeats the allegations contained within paragraphs 81 through 83 as if set forth herein at length.

85. **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** breached their fiduciary duty to **MED-STOP** through their acts and omissions relating to the March 22, 2021 Yacht sale transaction.

86. This breach resulted not only in **MED-STOP's** deposit related damages, but also in the deprivation of **MED-STOP's** ability to mitigate its damages.

87. But for this breach, **MED-STOP** could have, and would have, used its returned deposit monies to purchase its VanDutch yacht through a reputable broker.

88. At present, the cost of the same model VanDutch yacht specified in the Contract has increased by over $200,000.00.

**WHEREFORE, MED-STOP**, in addition to its alleged deposit related damages, demands judgment against **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** for additional damages measured by the difference between the cost of the VanDutch Yacht bargained for and the cost of the same model VanDutch yacht at time of judgment, any pre-judgment interest, and punitive damages as provided by law, together with such other and further relief as this Court shall deem just and equitable.

**COUNT VII**

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY:**

**VANDUTCH USA, INC. AND CDP**

19

89. **MED-STOP** repeats the allegations contained in paragraphs 84 through 88 as if set forth herein at length.

90. The alleged complicity of both **VANDUTCH USA, INC.** and **CDP** in failing to take action and notify the VanDutch yacht customers, including **MED-STOP**, of the wrongdoing by **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL**, aided, abetted, facilitated, permitted, and allowed such breach of fiduciary duty to continue.

91. Such complicity resulted in damage to **MED-STOP**.

**WHEREFORE, MED-STOP** demands judgment against **VANDUTCH USA, INC.** and **CDP**, not only for its deposit related damages, but for additional damages measured in the difference in value between the VanDutch Yacht bargained for and the cost of the same model VanDutch yacht at the time of judgment, any pre-judgment interest, and punitive damages, together with such other and further relief as this Court shall deem just and equitable.

## COUNT VIII

### FRAUD:

### VANDUTCH, INC., JACOBUS MAST, AND REED NICOL

92. **MED-STOP** repeats the allegations of paragraph 89 through 91 as if set forth herein at length.

93. The alleged acts, misrepresentations, and omissions of **VANDUTCH, INC., JACOBUS MAST**, and **REED NICOL** regarding the negotiation and sale transaction of **MED-STOP's** Yacht were done knowingly, intentionally, and willfully.

94. These alleged acts, misrepresentations, and omissions were fraudulent.

95. **MED-STOP** was intended to, and did, rely upon these acts, misrepresentations, and omissions in entering into the Yacht negotiation and sale transaction at issue.

96. These acts, misrepresentations, and omissions not only caused **MED-STOP** to deliver and lose its deposit, they served to hinder or preclude any practical mitigation of damages by **MED-STOP.**

WHEREFORE, **MED-STOP** demands judgment against **VANDUTCH, INC., JACOBUS MAST,** and **REED NICOL**, not only for its deposit related damages, but for additional damages measured by the difference in value between the VanDutch Yacht bargained for and the cost of the same model VanDutch yacht at the time of judgment, any pre-judgment interest, and punitive damages, together with such other and further relief as this Court shall deem just and equitable.

<u>**COUNT IX**</u>

<u>**AIDING AND ABETTING FRAUD:**</u>

<u>**VANDUTCH USA, INC. AND CDP**</u>

97. **MED-STOP** repeats the allegations contained in paragraphs 92 through 96 as if set forth herein at length.

98. The alleged acts, misrepresentations, and omissions of **VANDUTCH USA, INC.** (acting through **JACOBUS MAST** and **REED NICOL**), and **CDP** served to facilitate, through action and inaction, the fraud practiced by **VANDUTCH, INC., JACOBUS MAST,** and **REED NICOL** on VanDutch yacht customers and aided and abetted **VANDUTCH, INC., JACOBUS MAST,** and **REED NICOL** in defrauding **MED-STOP** relating to the negotiation and partial performance of the Yacht sale transaction at issue.

99. With full knowledge of this fraud, **CDP** chose simply to terminate its 2020 Distribution Agreement in May 2021 hoping that it could quietly distance itself from the many defrauded VanDutch yacht customers and evade **CDP's** own culpability.

100.    As a result of the alleged acts, misrepresentations, and omissions of **VANDUTCH USA, INC.** and **CDP**, **MED-STOP** has been damaged.

**WHEREFORE, MED-STOP** demands judgment against **VANDUTCH USA, INC.** and **CDP**, not only for its deposit related damages, but for additional damages measured by the difference in value between the VanDutch Yacht bargained for and the cost of the same model VanDutch yacht at the time of judgment, any pre-judgment interest, and punitive damages, together with such other and further relief as this Court shall deem just and equitable.

## JURY TRIAL DEMAND

A Jury Trial is demanded on all Counts so triable.

PAUL JOSEPH MCMAHON, P.A.
Counsel for **MED-STOP**
THE WISEHEART BUILDING
2840 SW Third Avenue
Miami, Florida 33129
Telephone: (305) 285-1222
Facsimile: (305) 858-4864
pjm@pjmlawmiami.com

BY: /s/ Paul J. McMahon
    Paul J. McMahon
    Fla. Bar No. 204552

Dated: May 19, 2023

# VanDutch

## Y A C H T S

**VANDUTCH, INC**

**WIRE INSTRUCTIONS**

Pay To:

**VanDutch Inc.**

2300 East Las Olas Boulevard

Ft. Lauderdale, FL 33301

Bank of America, N.A.

100 W 33rd Street

New York, NY

Account No.: ██████████

Wire Routing No.: 026009593

SWIFT: BOFAUS3N

# VanDutch ➤

## NEW PURCHASE AGREEMENT

| | | | |
|---|---|---|---|
| Buyer's Name | : Med-Stop, Inc. | Date | : 3/22/2021 |
| Cell Phone | : (847) 612-6584 | Make | : VanDutch |
| Business Phone | : N/A | Length | : 40 |
| E-mail Address | : pkwiecinski53@comcast.net | Model | : 40 |
| Sales Associate | : VDINC | Power | : 2 x Volvo 380 HP |
| Broker Contact | : N/A | FOB | : Fort Lauderdale, FL |
| Buyer's Address | : 2781 Marden Ct., Northbrook, Il 60062 | | |

Buyer agrees to purchase from VanDutch Inc. (called VanDutch) a VanDutch Yacht manufactured by CdP - VanDutch (Manufacturer) with assigned production number **40-178** (the "Yacht") with CIN number **IT-VDI40178XX22** in accordance with the following terms:

1. **Purchase Price.** The Yacht's purchase price (the "Purchase Price") is as follows:

| | |
|---|---|
| Base Retail Price (per plans and specifications; Exhibit A) | $745,000.00 |
| Additional Factory Options (Exhibit A) | $61,000.00 |
| Rigging and Preparations for Delivery, Incl. Fuel | Included |
| Extra Costs | Included |
| Transport Shipping to FOB Location | Included |
| | |
| **Total Retail Price:** | **$806,000.00** |
| | |
| *Signing & Lock-in Discount (by 3/23/2021)* | *-$54,075.00* |
| | |
| **Total Purchase Price:** | **$751,925.00** |
| *(Less Trade Allowance)* | *-$0.00* |
| **Net Purchase Price:** | **$751,925.00** |
| State Sales Tax (FL) | At Closing |
| Title/Registration Fee | At Closing |
| **Sub-Total:** | **$751,925.00** |

| | |
|---|---|
| Initial Deposit - Due at Signing | $150,385.00 |
| Due at Production Start | $150,385.00 |
| Due at Engine Installation | $150,385.00 |
| Due at Top Deck Installation | $150,385.00 |
| Due at Production Completion | $150,385.00 |

**Color:** Grey
**Esthec:** Platinum
**Upholstery:** TBD
**Bimini:** Black

Initials Buyer:

Initials VanDutch:

**VanDutch Inc.,** 2300 East Las Olas Boulevard, Ft. Lauderdale, FL 33301
Tel: +1 954 900 5195  Email: info@vandutchusa.com  Web: www.vandutchusa.com

# VanDutch ⟍

2.      **Payment Schedule**. Buyer shall pay the Purchase Price in accordance with the payment schedule set forth in above 1. Purchase Price overview. Buyer shall make each payment by cashier's check or wire transfer of cleared funds within 5 days of notice from VanDutch that payment is due. Any late payment shall bear interest at the rate of 1.5% per month (or the maximum lawful rate, if lower) until paid.

3.      **Scope of Work**. The Yacht shall conform substantially to the Plans and Specifications set forth in Exhibit A and shall include those Factory Options listed in Exhibit A. If there are any inconsistencies between this Agreement and the Plans and Specifications, this Agreement shall govern. The interpretation and implementation of the Plans and Specifications shall be in accordance with Manufacturer's standards and not pursuant to any classification society or trade association's standards or similar codes unless specified in this Agreement. Manufacturer, in its sole discretion, may substitute materials or modify the Plans and Specifications to improve the safety, performance, or quality of the Yacht. Manufacturer, further, may change the Plans and Specifications as to any subsequent hull without creating any obligation by Manufacturer or VanDutch to make corresponding changes to the Yacht, before or after delivery.

4.      **Changes**. Buyer must make written requests for any changes to the Plans and Specifications, including changes to options and upgrades. In response, VanDutch shall provide to Buyer a proposed change order, stating the cost or credit for the requested change, the required extension to the estimated delivery date, and any other applicable terms. Buyer may accept or reject the proposed change order, and in this regard, any proposed change order not accepted in writing within 10 days of receipt by Buyer shall be deemed rejected. Buyer shall pay VanDutch the cost of any change order at the time the change order is executed.

5.      **Work Progress**. VanDutch estimates that it will deliver the Yacht on or before October 29, 2021. VanDutch, however, has entered into this Agreement subject to its ability to obtain the Yacht from Manufacturer. Buyer acknowledges that VanDutch cannot guarantee that the Yacht will be delivered on a specific date and that Buyer has purchased the Yacht subject to Manufacturer's delivery schedule. VanDutch shall not be deemed in default of this Agreement, and Buyer may assert no claim for damages, based on VanDutch failure to deliver the Yacht on or before the estimated delivery date.

6.      **Title Documents**. Upon delivery of the Yacht and Buyer's payment of the total due, Manufacturer and VanDutch shall execute all documents necessary to transfer title to the Yacht to Buyer free and clear of all liens, except liens asserted by outside contractors retained by Buyer or otherwise caused by Buyer.

7.      **Construction Risk**. Buyer shall not bear risk of loss of the Yacht until delivered to Buyer. However, Buyer shall assume all risk of loss of any equipment, furnishings, and other property provided by Buyer or Buyer's outside contractors. If the Yacht sustains irreparable damage during its construction and prior to delivery, as determined in VanDutch sole discretion, VanDutch, at its option, may: (a) cause Manufacturer to commence new construction within 60 days of such loss, (b) refund to Buyer all payments then received from Buyer, in which case the parties will have no further obligations to one another under this.

*Initials Buyer*                                                                                    **Initials VanDutch:**

VanDutch Inc., 2200 Fast Las Ola Boulevard, Fl. Lauderdale, Fl. 33301
Tel +1 954 900-6195 *Email*: infovandutchusa.com Web: www.vandutchusa.com

# VanDutch ➤

**8.**   **Trade Vessel**

Make:                    Engines:                 Year:
Model:                   Hours:                   HIN:

Buyer shall deliver the Trade Vessel to VanDutch on or before **N/A**. On delivery, VanDutch may survey and sea trial the Trade Vessel, at its expense. If VanDutch determines, in its sole discretion, that the Trade Vessel is not in the condition represented or expected, or if there has been a significant change in the condition of the Trade Vessel, VanDutch shall have the right to make a reasonable adjustment in the trade allowance to account for such difference in value or VanDutch may terminate this Agreement. If VanDutch accepts the Trade Vessel, Buyer shall transfer to VanDutch good and marketable title to the Trade Vessel, free and clear of all liens, taxes, and duties outstanding or payable. Buyer shall indemnify and hold VanDutch harmless against and from any claim for damages brought against VanDutch by the purchaser of the Trade Vessel arising from any defect or deficiency, whether latent or patent, in the Trade Vessel. Buyer acknowledges that VanDutch has the right to market and sell the Trade Vessel prior to delivery of the Yacht. VanDutch will retain any sums received from sale of the Trade Vessel that exceed the trade allowance and shall not be obligated to extend to Buyer a credit for any such difference. If Buyer defaults in the performance of its obligations under the purchase agreement, VanDutch, at its option, may require Buyer to retake possession of the Trade Vessel or may sell the Trade Vessel, in which event the sales proceeds shall be deemed a deposit received from Buyer for purposes of Paragraph 17. If VanDutch defaults, Buyer shall be entitled to return of the Trade Vessel, if not previously sold, or payment of the actual price received by VanDutch, less trade payoff and sales expenses, including, without limitation, brokers' commissions, if previously sold. In no event, however, shall the trade allowance be deemed the measure of Buyer's damages.

**9.**   **Taxes**. Upon delivery of the Yacht, Buyer shall pay any sales, use, excise, duties, or other taxes (excluding only Manufacturer and VanDutch income taxes) arising from the sale, delivery or use of the Yacht and shall defend, indemnify, and hold harmless Manufacturer and VanDutch against and from any such taxes, and associated penalties and interest, that may be imposed. Buyer's indemnity obligations shall include reimbursement of Manufacturer and VanDutch reasonable attorney's fees in defending any actual or threatened assessment. Seller shall be entitled to receive the credit and any drawback on prepaid duties, if applicable.

**10.**   **Performance**. Any representations made by VanDutch or its employees or representatives, or contained in advertisements, brochures, or other publications, as to the Yacht's performance (e.g., speed, handling, fuel consumption) are estimates only and are not guaranteed. The Yacht's performance will vary depending upon its operator, added equipment, and other factors. Buyer acknowledges that he is not relying on any such representation in his purchase of the Yacht.

**11.**   **Financing**. The Buyer's obligations under this agreement are not contingent upon Buyer's obtaining financing to purchase the Yacht. Buyer acknowledges that VanDutch has made no representations or warranties with respect to Buyer's ability to obtain financing on the Yacht, to register or document the Yacht in any jurisdiction, or to obtain any type of mortgage on the Yacht.

**12.**   **Limited Warranty**. The Yacht is warranted by VanDutch in accordance with VanDutch Limited Warranty attached as exhibit C.

*Initials Buyer:*                                                          *Initials VanDutch:*

**VanDutch Inc.,** 2300 East Las Olas Boulevard, Ft. Lauderdale, FL 33301
*Tel:* +1 954 900 5195  *Email:* info@vandutchusa.com  *Web:* www.vandutchusa.com

# VanDutch ⋗

**13.** **Arbitration**. In the event of a dispute arising out of this Agreement, either party (the disputing party) shall notify the non-disputing party in writing, specifying with particularity the nature of the dispute. The parties shall then enter into discussions, acting in good faith to resolve the dispute for a period of thirty (30) days ("Good Faith Resolution Period"). The parties shall submit to arbitration any dispute arising from this Agreement, which was not resolved during the Good Faith Resolution Period. Either party may initiate arbitration by sending written notice to the other(s) of election of the right of arbitration. The arbitration shall be conducted under the auspices of the USA Arbitration Association ("AAA") and in accordance with AAA's Commercial Arbitration Rules. The requesting party shall file the demand for arbitration and pay the required filing fee. The arbitration hearings shall be held at a place designated by the arbitrator in the County in which Seller's office is located. The arbitrator shall observe the Code of Ethics for Arbitrators in Commercial Disputes promulgated by AAA and the USA Bar Association, or any successor code. The prevailing party in the arbitration shall be entitled to recover its costs and reasonable attorney's fees as part of the reward.

**14.** **Buyer's Default**. If Buyer fails to make any payment required hereunder, or if Buyer otherwise defaults in the performance of Buyer's obligations under this Agreement and such default is not cured within 5 days of its occurrence, VanDutch may exercise, jointly or severally any of the following remedies at its option without notice: (a) VanDutch may cause the suspension of all work on the Yacht and cancel equipment and material orders until Buyer cures its default; if work is suspended, the Yacht may, in Manufacturer's sole discretion, be rescheduled on Manufacturer 's production schedule and subordinated to other yachts under construction or to yachts not yet started; Buyer shall be liable in addition to the Purchase Price for all costs and expenses attendant to suspension of work, including, but not limited to relocating the Yacht, storage, interest, insurance, and wage and price costs in excess of those that would have been incurred but for the default, or (b) VanDutch shall have the right to cancel this agreement without further notice to Buyer. In the event of such cancellation, Buyer shall thereupon become indebted to VanDutch in an amount equal to all sums received by Seller as deposits, and that VanDutch may retain said deposits as and for liquidated damages within the meaning of section 2-718 of the Uniform Commercial Code. Buyer agrees that the amount of such liquidated damages is reasonable in light of the anticipated or actual harm caused by failure, the difficulty of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy.

**15.** **VanDutch's Default**. If VanDutch defaults in the performance of its obligations under this Agreement and such default is not cured within 90 days following receipt of notice from Buyer regarding the default, Buyer, as its sole and exclusive remedy, shall be entitled to a return of all payments made to VanDutch pursuant to this Agreement, and in the event of a trade, return of the Trade Vessel, if not previously sold, or payment of the actual price received by VanDutch, less trade payoff and sales expenses, including, without limitation, brokers' commissions, if previously sold, as provided in Paragraph 4. In no event, however, shall the trade allowance be deemed the measure of Buyer's damages. Buyer acknowledges that a portion of the Purchase Price received from Buyer, including the value of the Trade Vessel, will be paid by VanDutch to Manufacturer as progress payments toward the construction of the Yacht. In lieu of the return of all payments, including the value of the Trade Vessel, the net proceeds of the Trade Vessel or the Trade Vessel itself, to Buyer in the event of a default, VanDutch, at its sole option, may assign to Buyer its rights against Manufacturer relating to the Yacht to the extent of its payments to Manufacturer on account of the Yacht, and the obligation of VanDutch to return the payments, including the value of the Trade Vessel, paid by Buyer shall be limited to the difference

*Initials Buyer:*

*Initials VanDutch:*

**VanDutch Inc.**, 2300 East Las Olas Boulevard, Ft. Lauderdale, FL 33301
*Tel:* +1 954 900 5195  *Email:* info@vandutchusa.com  *Web:* www.vandutchusa.com

# VanDutch

between the total of the payments, including the value of the Trade Vessel, made by Buyer to VanDutch and the total of the payments made by VanDutch to Manufacturer. BUYER, WITHOUT LIMITATION TO THE FOREGOING, SPECIFICALLY ACKNOWLEDGES THAT VANDUTCH SHALL NOT BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOSS OF INCOME, LOSS OF USE, COMMERCIAL LOSS, OR LIABILITY BUYER INCURS TO ANY THIRD PARTY.

16.    **Force Majeure.** Neither party shall be responsible for delays or failures in performance resulting from a force majeure event. For purposes hereof, a "force majeure" event includes, without limitation, acts of God, acts of terrorism, strikes, lockouts, riots, acts of war, fire, communication line failures, computer viruses, pandemics, power failures, accidents, tropical storms, hurricanes, earthquakes, or other natural disasters.

17.    **Miscellaneous**.  This Agreement shall he governed by the internal laws of the State of Florida, both as to interpretation and performance. This Agreement constitutes the full and complete agreement between the parties, except as set forth in any initialed addendum attached hereto. There are no other understandings or agreements between the parties, oral or written. This Agreement may be modified only by written amendment signed by both parties.

If any provision of this Agreement is held invalid, such invalidity will not affect other provisions. Where a provision can be construed as valid, it will be so construed. Buyer may not assign this Agreement without VanDutch's written consent. VanDutch is an independent business enterprise and not an agent of its distributor or the manufacturer and no party to this Agreement shall make such a claim. Any notice to be given hereunder will be deemed delivered one day after being sent by any recognized overnight delivery service to the applicable party at the respective addresses set forth at the beginning of this Agreement.

This Agreement will be binding on the parties and their respective heirs, legal representatives, successors, and assigns.

18.    **Extras**.
No extras have been listed.

THIS AGREEMENT IS NOT BINDING UPON OR ENFORCEABLE AGAINST VANDUTCH UNTIL SIGNED BY A VANDUTCH CORPORATE OFFICER. BUYER ACKNOWLEDGES THAT BUYER HAS READ, UNDERSTOOD, AND ACCEPTED THE TERMS SET FORTH ABOVE AND IN THE ATTACHED EXHIBITS.

_MED-STOP, INC._
Buyer Print:                                          VanDutch - Print:

Signature and Title:                              Signature and Title:

_3.22.2021_                                       _3/22/2021_
Date:                                                    Date:


Deposit Received-VanDutch:                 Date:
*Initials Buyer:*                                                                         *Initials VanDutch:*

**VanDutch Inc.,** 2300 East Las Olas Boulevard, Ft. Lauderdale, FL 33301
**Tel:** +1 954 900 5195  **Email:** info@vandutchusa.com  **Web:** www.vandutchusa.com